UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RAFAELA AGUILLON DELOZANO,

Plaintiff,

v.

CAROLYN W. COLVIN,

Defendant.

Case No.  13-cv-03726-JCS

**ORDER RE CROSS MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 27, 28

I.      **INTRODUCTION**

On May 3, 2006, Plaintiff filed an application for disability insurance benefits pursuant to Title II of the Social Security Act.  The agency denied Plaintiff's claim initially and on reconsideration, and an Administrative Law Judge ("ALJ") convened a hearing on August 19, 2009.  In a decision dated September 10, 2009, the ALJ found that Plaintiff was not disabled. The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final determination of the Commissioner of Social Security ("Commissioner").  Plaintiff timely filed the complaint in this action seeking review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g), which gives the Court jurisdiction to review the final decision of the Commissioner.

Presently before the Court are cross motions for summary judgment.  Plaintiff asks the Court to reverse the decision of the Commissioner and award benefits or, alternatively, remand for further proceedings.  Defendant asks the Court to affirm the Commissioner's decision denying benefits. The parties have consented to the jurisdiction of the undersigned United States magistrate judge pursuant to 28 U.S.C. § 636(c).  For the reasons stated below, the Court GRANTS Plaintiff's summary judgment motion, DENIES Defendant's summary judgment motion, reverses the decision of the ALJ and remands to the Commissioner for further proceedings.

United States District Court
Northern District of California

## II.   BACKGROUND

### A.   Ms. DeLozano's Background

Ms. DeLozano testified at the administrative hearing that she was born on October 24, 1959 and completed five years of school in El Salvador.  Administrative Record ("AR") at 38; *see also* AR 110 (Disability Report -Adult, reflecting that Plaintiff's highest grade of school completed was seventh grade, which she completed in 1975).  She worked in a packing job at a cable company from 1993 until February 2006.  AR 107.  She has not been employed since that time.  AR 98.  Her alleged disability onset date is February 22, 2006.  AR 106.

### B.   English Language Ability

In the Disability Report, in response to the question "[c]an you speak and understand English," Ms. DeLozano answered "[n]o."  AR 105.  In response to a follow-on question asking "[w]hat language do you prefer," she answered "Spanish."  AR 105.  In the same report, in response to the question "[c]an you read and understand English," Ms. DeLozano answered "no."  AR 106.  Similarly, in response to the question "[c]an you write more than your name in English," Ms. DeLozano answered "no."  AR 106.

Plaintiff's Function Report -Adult was completed for her by Anna Bonilla, who is Plaintiff's daughter. AR 52, 126, 132.[1]  Ms. Bonilla also served as a translator during the administrative hearing, at which Plaintiff appeared by videoconference.  AR 36.  At the Administrative hearing, Plaintiff's attorney acknowledged that Ms. Bonilla was "not a regular interpreter" and instructed her that "what you need to do is when we ask you a question or say something, you need to interpret it for your mother.  When she says something, you need to interpret it back in English."  AR 37.  The ALJ added that Ms. Bonilla should interpret "exactly what [her] mother said," without using the words, "she said."  AR 37.

At the hearing, Plaintiff testified that she could "read and write Spanish" but that she could

---

[1] Ms. Bonilla is referred to as "Ms. Monia" in the transcript of the administrative hearing, in which the Court reporter notes that the spelling is phonetic.  AR 36.  Plaintiff's counsel also refers to "Ms. Monia."  The Court presumes that "Anna Bonilla" and "Anna Monia" are the same individual and that the spelling used in the Disability Report, AR 126, and the Function Report, AR 132, is the one that is correct.

not "read and write English."  AR 38-39.  She was not asked and did not testify as to whether she could understand spoken English or speak English herself.  It appears that during the administrative hearing, Ms. DeLozano may have responded to some questions without waiting for her daughter to translate them.   In particular, at one point the ALJ said, "She seems to understand English.  What's the problem?  Why does she need an interpreter.  She seems to understand everything Mr. Hogani is saying."  AR 40.  At that point, her attorney instructed her, "When you understand what I ask, you can answer directly."  AR 40.  There is nothing in the transcript, however, that indicates which questions were translated for Ms. DeLozano and which ones were not.  Nor does the transcript indicate whether Ms. DeLozano ever responded in English, though nothing contained in the transcript suggests that she did.

### C.    Medical History

#### 1.  Hip and Knee Surgery

 Plaintiff underwent left hip replacement surgery in August 2003.  AR 171.   After the hip surgery, Plaintiff reported that she returned to work on "light duty" and "spent most of her time sitting" but she had trouble walking when she got up, causing her employer to send her home.  AR 161.  On October 24, 2005, Plaintiff was seen by Dr. Robert Vazquez.  AR 160.  She complained that for three days she had been experiencing pain in her left hip in the area of her previous surgery.  AR 160.  On January 19, 2006, she reported to Dr. Vazquez that she was experience pain in her left hip and her right knee.  AR 161. Dr. Vazquez placed Plaintiff on disability and referred Plaintiff for an MRI of her right knee.  AR 161.  The MRI was performed on February 8, 2006 and revealed a "[v]ery subtle tear . . . of the meniscus," as well as "Grade IV chondromalacic changes," "small joint effusion" and "prepatellar bursitis."  AR 164.

 Based on the results of the MRI, Dr. Vazquez referred Plaintiff to a Dr. Atkins, who did not recommend surgery on Plaintiff's right knee.   AR 162.  On May 18, 2006, Dr. Vazquez, who had extended Plaintiff's disability several times since January 2006, noted that Plaintiff's right knee remained unstable and that he was recommending "permanent disability."  AR 162.  A letter from Dr. Vazquez dated June 6, 2006 states as follows:

> I am recommending permanent disability for Ms. Rafaela Lozano.

> Her knee remains unstable and her orthopedic surgeon does not recommend surgery.   It is on [this] basis that I recommend permanent disability.

AR 226.[2]  The last treatment note from Dr. Vazquez is dated May 18, 2006.

Plaintiff had arthroscopy performed on her right knee in August 2006, performed by Dr. Lewis Nissen at St. Luke's Health Care Center.  AR 168, 171, 188.[3]  The only medical record in the Administrative Record from St. Luke's is a letter by Dr. Nissan stating that Plaintiff "recently underwent a knee arthroscopy" and that she was a candidate for a "Unicompartmental Knee Arthroscopy" because she demonstrated "bilateral compartmental osteoarthritis."  AR 188.

On October 5, 2006, Plaintiff was examined by Dr. Manlove-Simmons, a consultative examiner.  AR 168-170.  Dr. Manlove-Simmons summarized Plaintiff's concerns as "hip pain" that occurs "mostly when she walks" and "knee pain" that occurs when Plaintiff  "walk[s] long distance."  AR 168.  She noted that Plaintiff had hip replacement surgery in August 2003 and right knee surgery in August 2006.  AR 168.  She described Plaintiff as "obese, pleasant and cooperative patient, in no acute distress" on the day of the office visit.  AR 169.  She listed Plaintiff's height as 62 inches and her weight as 185 pounds.  AR 169. She observed that Plaintiff had "full range of motion of all joints except for the right knee."  AR 169.   Dr. Manlove-Simmons found that "[s]traight leg lift of the right leg to 56 degrees produced pain in leg and hip" and that "[l]eft leg raise to 110 degrees produced pain in hip."  AR 169. She noted that Plaintiff had a 12 cm scar "on the top of the right knee/ thigh region."  AR 169.  According to Dr. Manlove-Simmons, Plaintiff's "[g]ait was unaffected."  AR 170.  Plaintiff had right leg strength at a level four out of five and normal strength in all other extremities, no muscle atrophy, normal muscle tone, and she was neurologically intact.  AR 170.  Dr. Manlove-Simmons diagnosed Plaintiff with "[h]ip and knee pain - secondary to osteoarthritis."  AR 170.  In a questionnaire that Plaintiff

---

[2] The June 6, 2006 letter was submitted on December 2, 2009, after the ALJ had issued his written decision but before the Commissioner's decision became final. *See* AR 10-11.
[3] The only medical record from this procedure is a note from Dr. Nissen describing it as "knee arthroscopy."  AR 188.  Elsewhere in the record, Plaintiff and others simply refer to the procedure as "surgery."  "Arthroscopy" refers to the use of a fiber-optic video camera through a small incision to examine, and sometimes repair, tissue.  *See* http://www.medicinenet.com/ script/ main/art.asp?*articlekey=2357*, Definition of Arthroscopy, last accessed March 27, 2015.  There are no medical records in this case that provide any details as to the nature of the knee arthroscopy that was performed on Plaintiff in August 2006.

United States District Court
Northern District of California

provided to Dr. Manlove-Simmons, Plaintiff reported that she took hydrocodone 500 mg every 4 to 6 hours and Ibuprofen 800 mg for pain.  AR 171.

Dr. Manlove-Simmons also ordered x-rays of Plaintiff's hips and AP pelvis.  AR 174. These revealed that Plaintiff's left hip prosthesis was "in satisfactory position with no acute changes" but that as to her right hip, there was "evidence of subchondral lunacy with some spurring in the superior and lateral aspects of the acetabulum."  AR 174.  Follow-up was recommended. AR 174.

On December 5, 2006, Plaintiff went to a clinic in Florida, where she complained of "daily pain" following her knee surgery, as well as tenderness in her right shoulder.  AR 191.  She said that she was taking Ibuprofen for the pain. AR 191.  The provider prescribed Ultram 50 mg and noted that Plaintiff "[n]eed[ed] to see orthopedist." AR 191.  On January 19, 2007, Plaintiff was seen again at the same clinic, by Dr. Karl Astaphan.  AR 192, 202.  Treatment notes state that the Ultram "helps knee pain." AR 192.  On the same date, Dr. Astaphan recommended that Plaintiff's right knee be x-rayed to determine whether she suffered from osteoarthritis. AR 192.  On March 26, 2007, Dr. Astaphan noted that Plaintiff continued to complain of knee pain and again noted that the knee should be x-rayed. AR 222.  On December 5, 2007, Dr. Astaphan saw Plaintiff again, noting that she had suffered from knee pain "on and off for 3 years" and "need[ed] surgery" but that she had no money for it.  AR 221.  In subsequent visits to Dr. Astaphan in 2008 and 2009 Plaintiff continued to complain of knee pain, as well as hip pain, and reported that the Ultram "help[ed] a lot" but that her knee "still acts up some days." AR 206, 208, 209, 210, 218.

## 2. Function Report

Plaintiff completed a Function Report on May 25, 2006. AR 110-126.  In it, she describes her daily activities as follows:

> I go for a walk for 1/2 hour in the morning.  I help my daughter cleaning a little bit.  Sometimes I cook soups, cook beans, but most of the time I sit down because my knees and hip start hurting.

AR 110.  She writes that she sometimes wakes up in the middle of the night with "horrible pain" in her knees and that she has trouble bending down and needs her daughter to put her shoes on for her.  AR 120. She states that she prepares meals "weekly" and that she does not do so more

frequently because her knees and hips start hurting when she stands "for a long time." AR 121.

She states that she sometimes helps her daughter clean the kitchen but that it takes her two hours

because she does it slowly. AR 121. She states that she likes to read the bible and watch the news

and that these activities are "really good" and are not affected by her hip and knee pain because

she can do them in bed or sitting down. AR 123. She writes that she goes to church with her

daughter "almost every day." AR 123. She states that she cannot lift, squat or bend because her

"knees start hurting in bones," and that she cannot stand and reach, walk, or kneel for more than

1/2 hour because of her arthritis, and that she takes Tylenol and Ibuprofen three times a day for

pain. AR 124.

### 3. Residual Functional Capacity Assessments

Although none of the doctors who treated or examined Ms. DeLozano evaluated her

residual functional capacity, two agency medical consultants who reviewed Plaintiff's file

completed Physical Residual Capacity Assessments. First, Hector Manlapas completed a Physical

Residual Capacity Assessment dated October 20, 2006. AR 179-186. Mr. Manlapas concluded

that Plaintiff could occasionally lift up to 20 pounds, frequently lift up to 10 pounds, stand and sit

for 6 hours in an 8-hour work day, had unlimited ability to push and pull, could climb ramps and

stairs frequently but could never climb ladders, ropes or scaffolding, had unlimited ability to

stoop, kneel and crouch, could crawl occasionally and had no manipulative, visual, communicative

or environmental limitations. AR 179-183. With respect to Plaintiff's symptoms, Mr. Manlapas

wrote, "Cl is partially credible as cl should be capable of perform RFC as outlined." AR 184. He

noted that there were notes from treating sources that contained conclusions that were

"significantly different" from his own. AR 185. The follow-up question asked the evaluator to

"explain why conclusions [of the treating sources] are not supported by the evidence," listing the

"source's name and the statement date." AR 185. Mr. Manlapas wrote, "see page 8." Page 8

contained a summary of Plaintiff's medical records but did not list any specific treatment

providers; nor did it make clear which opinions were deemed not to be supported by the evidence.

AR 186. Mr. Manlapas did note, however that "01/06, 03/06, 05/06 TP statement in file states that

cl cannot work, suggest permanent disability. Statements are reserved to the Commissioner." AR

United States District Court
Northern District of California

1    186.

2           Another Physical Residual Capacity Assessment, dated February 15, 2007, was completed

3    by William Render.  AR 194-201.  Mr. Render found the same exertional limitations as Mr.

4    Manlapas (occasionally lift/carry up to 20 pounds, frequently lift/carry up to 10 pounds,

5    stand/walk 6 hours in an 8-hour work day and unlimited pushing and pulling).  AR 195.  He noted,

6    however, that while "claimant had right knee orthoscopy [sic] on 08.28.2006 [and] . . .[r]eportedly

7    . . . needs a 2nd operation . . . [w]e don't have these records."  AR 195.  Mr. Bender found that

8    Plaintiff's postural limitations were somewhat more limited than Mr. Manlapas had found, finding

9    that she could kneel and climb ramps and stairs only occasionally.  AR 196.  He agreed with Mr.

10   Manlapas that she had no manipulative, visual, communicative or environmental limitations.  AR

11   197-198.  He also agreed that Plaintiff's allegations as to the severity of her symptoms was

12   "partially credible."  AR 199.  He did not answer the question as to whether his conclusions

13   differed from those of treating/examining sources.  AR 200.  Nor did he answer the follow-up

14   question asking for an explanation of his conclusion and identify the treating source and statement

15   date.  AR 200.

16          **D.    Administrative Hearing**

17                 **1.  Testimony of Ms. DeLozano**

18          At the hearing, Plaintiff testified that before her hip replacement surgery, in 2003, she

19   performed her work standing but that after the hip replacement surgery, she worked sitting down.

20   AR 40-41.  She testified that she has no strength in her knee and that it hurts if she is sitting down,

21   standing or walking.  AR 41.  She testified further that she has pain in her left hip, that she uses a

22   cane to help her walk, and that she takes pain medication.  AR 41-42.  Plaintiff testified that the

23   doctor has recommended another hip surgery and surgery on her right knee but that she does not

24   have insurance or money to pay for the surgery.  AR 42-44.   She testified that she takes a walk

25   every day, that she helps "a little bit" with household chores, including cleaning windows, but that

26   she performs them slowly.  AR 43.

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

### 2.  Testimony of Vocational Expert

The ALJ also called a vocational expert ("VE"), Deborah Durham, to testify.  AR at 36. Ms. Durham testified that Plaintiff's last job was as a hand packager, under DOT no. 920.587-018, which is usually classified as a medium exertion level job, unskilled, at SVP level 2, but that as Plaintiff described her past work, it would be in the light exertional range.  AR 45.   The ALJ then solicited testimony from the VE about the types of jobs that would be available for several hypothetical individuals.  AR at 62-64.  First, he asked if the following hypothetical individual would be capable of performing Plaintiff's past relevant work as a hand packager:  an individual who could perform occasional lifting and carrying of up to 20 pounds and frequent lifting and carrying of up to 10 pounds, was able to stand and walk 6 out of 8 hours a day, could sit up to 6 hours a day, could use ramps and stairs occasionally, could never use ladders, ropes and scaffolds and was able to stoop occasionally.  AR 45.  The VE testified that such an individual would be able to perform Plaintiff's past relevant work.   AR 45.

Next, the ALJ modified the limitations to reduce the time spent standing and walking to 2 hours in an 8-hour work day.  AR 45.  With that modification, the VE testified that the hypothetical individual would not be able to perform Plaintiff's past relevant work.  AR 45.  She testified that there would be jobs available with those limitations, but only if that individual could "communicate in the English language."  AR 45-46.

Next, the ALJ asked if there would be jobs available for an individual who was "at sedentary" and could communicate in the English language.  AR 47.  The VE testified that such an individual could work as a hand packager at the sedentary level, "various assembly-type jobs such as lens inserter," as a plastic parts assembler, or in "various inspecting- type jobs such as a hand bag frame inspector" or an eyeglass frame inspector.  AR 47

Finally, the ALJ added the limitation that the individual would have to be absent from the workplace at least twice a month on a regular basis due to her multiple symptoms.  AR 47.  The VE responded that this limitation would preclude all work. AR 47-48.

United States District Court
Northern District of California

### E.   Five-Step Analysis and ALJ's Findings

#### 1.   Five-Step Framework

A claimant is eligible for disability benefits under the SSA if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 423(a)(1). But the claimant is only disabled if her physical or mental impairments are of such severity that she cannot do her previous work and "cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The Commissioner established a sequential five-step evaluation process to determine whether a claimant meets this definition. 20 C.F.R. § 404.1520(a). If the Commissioner concludes that the claimant is or is not disabled at one of the steps, the Commissioner does not proceed to the next step. *Id.* § 404.1520(a)(4). Otherwise, the evaluation proceeds to the next step. The claimant bears the burden of proving Steps One through Four. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). At Step Five, the burden shifts to the Commissioner to prove that the claimant can perform other work. *See Distasio v. Shalala*, 47 F.3d 348, 349 (9th Cir. 1995).

At Step One, the Commissioner considers the claimant's work history. 20 C.F.R. § 404.1520(a)(I). If the claimant is doing "substantially gainful activity," the claimant is not disabled. *Id.* If not, then the evaluation proceeds to Step Two. *Id.*

At Step Two, the Commissioner considers whether the claimant has a "severe medically determinable physical or mental impairment" or combination of such impairments that has lasted or is expected to last more than 12 months. *Id.* § 404.1520(a)(ii). An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." *Id.* § 404.1520(c). "[T]he step two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (citing *Bowen v. Yuckert*, 482 U.S. 137, 153-54 (1987)). "A claim may be denied at step two only if the evidence shows that the individual's impairments, when considered in combination, are not medically severe, i.e., do not have more than a minimal effect on the person's physical or mental ability(ies) to perform basic

1  work activities." Social Security Ruling ("SSR") 85-28. If medical evidence does not clearly

2  establish such a finding, the evaluation proceeds to the next step. *Id.*

3      At Step Three, the Commissioner compares the claimant's impairment(s) with a list of

4  impairments that the Commissioner has determined are disabling ("Appendix 1"). 20 C.F.R. §

5  404.1520(a)(iii). If the impairment(s) "meets or equals" in severity an item on the list and meets

6  the duration requirement, the claimant is disabled. *Id.* Otherwise, the Commissioner proceeds to

7  Step Four. *Id.*

8      At Step Four, the Commissioner considers the claimant's Residual Functional Capacity

9  ("RFC"). 20 C.F.R. § 404.1520(a)(4)(iv). A claimant's RFC is the most the claimant can do in

10 light of the physical and/or mental limitations caused by the impairment(s). *Id.* § 404.1545. If the

11 claimant can perform her past relevant work, she is not disabled. *Id.* Past relevant work is work

12 that the claimant has done in the fifteen months prior to the evaluation and was substantial gainful

13 activity that lasted long enough for the claimant to learn to do it. *Id.* § 404.1560(b)(I). If the

14 claimant cannot perform her past relevant work, the evaluation proceeds to Step Five. *Id.* §

15 404.1545.

16     At Step Five, the Commissioner has the burden to demonstrate that the claimant can

17 perform "other work" that exists in "significant numbers" in the national economy, taking into

18 account the claimant's RFC, age, education, and work experience. *Tackett v. Apfel*, 180 F.3d

19 1094, 1100 (9th Cir. 1999) (citing 20 C.F.R § 404.1560(b)(3)); 20 C.F.R § 404.1520(a)(v). If the

20 Commissioner finds the claimant can make an adjustment to other work, she is not disabled. *Id.*

21 If she cannot, she is disabled and eligible for disability benefits. *Id.*

22          **2.  ALJ's Findings**

23     At Step One, the ALJ found that Ms. DeLozano has not engaged in substantial activity

24 since February 22, 2006, the alleged onset date.  AR 29.

25     At Step Two, the ALJ found that Plaintiff had the following severe impairments: hip and

26 knee pain. AR 29.

27     At Step Three, the ALJ found that Ms. DeLozano did not have an impairment or

28 combination of impairments that meets or medically equals the severity of one of the listed

10

impairments in Appendix 1. AR 29.

At Step Four, the ALJ found that Plaintiff had the following RFC:

> the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). She can lift/carry 20 pounds occasionally and 10 pounds frequently; **stand walk hours in an 8 hour day**; sit 6 hours in an 8 hour workday; and occasionally climb ramps/stairs; never climb ladders, ropes, scaffolds; and occasionally stoop.

AR 30 (emphasis added).[4]  The ALJ found that while Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" her "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  AR 31.  First, the ALJ acknowledged that Plaintiff's hip and knee surgery to address her pain would "normally weigh in the claimant's favor, it is offset by the fact that the record reflects that the surgery was generally successful in relieving the symptoms." AR 31.  Second, the ALJ cited Plaintiff's daily activities, such as going for a 1/2 hour walk daily, sometimes cooking soups or beans, going shopping every two to three months, and going to church almost every day.  AR 31.  The ALJ found these activities were not consistent with Plaintiff's "complaints of disabling symptoms and limitations."  AR 31.  He further reasoned that if Plaintiff was suffering from "progressive physical deterioration," she would experience "intense and continuous pain."  AR 31.  He found that there were "no significant clinical or laboratory abnormalities one would expect if the claimant were in fact disabled."  AR 32.  He also wrote that "the record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than those determined in this decision."  AR 32.

At Step Five, the ALJ concluded that Plaintiff was not disabled because she could perform

---

[4] As is reflected in the highlighted language, the ALJ failed to state the number of hours he found that Plaintiff could stand/walk in an 8 hour work day.  Nor does the discussion that follows indicate how many hours he found Plaintiff could stand/walk in an 8 hour workday.  However, his conclusion at Step Five – that Plaintiff could perform her past relevant work – suggests that the ALJ found that Plaintiff could stand/walk 6 hours out of an 8 hour work day as the only hypothetical individual the VE testified could perform Plaintiff's past relevant work could stand and walk 6 hours in an 8 hour workday.  *See* AR 45.

1    her past relevant work as a hand packager, not only at the light exertional level described by

2    Plaintiff but also "as actually and generally performed."   AR 32. As an alternative ground for

3    finding that Plaintiff is not disabled, the ALJ noted that Plaintiff could perform sedentary,

4    unskilled work as a hand packager, various assembly jobs such as a lens inserter  or plastic parts

5    assembler, or as a "hand back [sic] inspector" or eyeglass frame inspector.  AR 32-33.  In reaching

6    this conclusion, the ALJ apparently assumed that Plaintiff could communicate in English but did

7    not address that issue.

### F.    Contentions of the Parties

9         In Plaintiff's  summary judgment motion, she asks the Court to reverse the

10   Commissioner's denial of disability benefits on the following grounds:  1) her right to Due Process

11   was denied because the ALJ used an unqualified interpreter and failed to address in his decision

12   Plaintiff's language difficulties or educational level; 2) the ALJ did not address all of Plaintiff's

13   impairments to the extent he did not consider her obesity, as required under Social Security Ruling

14   ("SSR") 02-1p;  3) the denial of benefits is not supported by substantial evidence to the extent the

15   ALJ fails to address significant facts in the medical records that contradict his conclusion,

16   including the letter by Dr. Vazquez recommending permanent disability.

17        The Commissioner contends the ALJ was entitled to rely on Plaintiff's daughter to

18   interpret because Plaintiff was represented by counsel at the hearing and he did not object.   The

19   Commissioner further contends the ALJ adequately considered Plaintiff's obesity, which is

20   acknowledged in his decision, and moreover, that there is no evidence in the record that Plaintiff's

21   obesity limited her in any way.  Finally, the Commissioner argues that the finding that Plaintiff is

22   not disabled is supported by substantial evidence.  The Commissioner rejects Plaintiff's reliance

23   on the June 6, 2006 letter from Dr. Vazquez finding that Plaintiff was permanently disabled,

24   arguing that the ultimate question of whether an individual is disabled (as opposed to medical

25   findings supporting such a conclusion) is not entitled to deference.

## III.    ANALYSIS

### A.    Legal Standard

28        When reviewing the Commissioner's decision, the Court takes as conclusive any findings

of the Commissioner that are free from legal errors and "supported by substantial evidence." 42

U.S.C. § 405(g). Substantial evidence is relevant evidence that a reasonable mind might accept as

adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence means "more

than a mere scintilla" but "less than a preponderance." *Desrosiers v. Sec'y of Health and Human

Serv.*, 846 F.2d 573, 576 (9th Cir. 1988) (citations omitted). Even if the Commissioner's findings

are supported by substantial evidence, they should be set aside if proper legal standards were not

applied when using the evidence to reach a decision. *Benitez v. Califano*, 573 F.2d 653, 655 (9th

Cir. 1978).

In reviewing the record, the Court must consider both the evidence that supports and

detracts from the Commissioner's conclusion. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir.

1996). "The ALJ is responsible for determining credibility, resolving conflicts in medical

testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)

(citing *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989)). The Court "must uphold the

ALJ's decision where the evidence is susceptible to more than one rational interpretation." *Id.* at

1039-40. However, a reviewing court must consider the record as a whole and may not affirm

simply by isolating a "specific quantum of supporting evidence." *Robbins v. Soc. Sec. Admin.*, 466

F.3d 880, 882 (9th Cir. 2006) (citing *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989)).

Further, "[i]n Social Security cases the ALJ has a special duty to fully and fairly develop the

record and to assure that the claimant's interests are considered." *Smolen v. Chater*, 80 F.3d at

1288 (quoting *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir.1983)). "This duty exists even when

the claimant is represented by counsel." *Id.*

**B.     Whether Failure to Use Certified Interpreter at Hearing Violated Plaintiff's Due
        Process Rights**

"In a disability hearing, a claimant is entitled to 'a full hearing under the Secretary's

regulations and in accordance with the beneficent purposes of the Act.'" *Martinez v. Astrue*,  Case

No. 07-cv-0699, 2009 WL 840661, at *1 (D. Conn., March 30, 2009) (quoting *Gold v. Secretary

of HEW*, 463 F.2d 38, 43 (2d Cir.1972)). Further, "traditional notions of due process would

suggest that without an interpreter, a claimant unable to communicate in English would hardly receive 'a full hearing . . . in accordance with the beneficent purposes of the [Social Security] Act.'" *Id. Echevarria v. Sec'y of Health and Human Serv*., 685 F.2d 751, 755 (2d Cir.1982)). Thus, the Social Security Administration's own internal procedures require that "[p]rior to the hearing, the administrative law judge (ALJ) will determine whether the claimant needs an interpreter at the hearing." Social Security Administration's Hearings, Appeals, and Litigation Law Manual ("HALLEX") at I-2-6-10 (http://www.socialsecurity.gov/OP_Home/hallex/I-02/I-2-6-10.html, last updated 11/14/14). Under HALLEX, one ground for finding that an interpreter is required is that the claimant has indicated on her Disability Report that her "ability to speak and understand English is limited." HALLEX at I-2-1-70. If the ALJ finds that an interpreter is necessary, the ALJ "will ensure that a qualified interpreter . . .is present throughout the hearing." HALLEX at I-2-6-10(A). Where the ALJ does not use an interpreter hired by the Social Security Administration, he or she must certify "under penalty of perjury" that:1) he or she has no prior relationship to the person testifying; 2) he or she is not acting as the person's legal representative; and 3) he or she will accurately interpret the questions asked and the answers given to the best of his or her ability. HALLEX at I-2-6-10 (B); *see also* HALLEX at I-2-1-70(B) (listing criteria for "Qualified Interpreter," including the requirement that the interpreter "[h]as no personal stake in the outcome of the case or other association with the case that would create a conflict of interest").

Clearly, the ALJ did not follow the internal procedures of the Social Security Administration in permitting Plaintiff's daughter to serve as an interpreter at the hearing. Plaintiff had stated on her Adult Disability form that she did not speak or understand English, and the ALJ did not appear to question the need for an interpreter at the hearing. Yet he failed to certify that Plaintiff's daughter met the requirements of HALLEX I-2-6-10(B). Indeed, because Anna Bonilla is Plaintiff's daughter, she could not have been certified.[5] Further, as the hearing transcript reflects, the ALJ was aware that Anna Bonilla was not a "regular interpreter" and that she was

---

[5] HALLEX makes clear that "[u]sing an interpreter does not mean that an ALJ must find that a claimant has an 'inability to communicate in English' as a vocational factor under 20 CFR 404.1564(b)(5) and 416.964(b)(5)." HALLEX at I-2-6-10, Note. As discussed further below, the ALJ failed to address that question as well, either at the hearing or in his written decision.

14

Plaintiff's daughter.  *See* AR 37.  While troubling, these shortcomings do not establish a Due Process violation, however.

First, "HALLEX is an 'internal guidance tool' for use by ALJs and other staff members, is not published in either the Federal Register or the Code of Regulations, and does not have the force of law." *Sim v. Astrue*, Case No. 12-cv-0768, 2013 WL 489606, at *8 (C.D. Cal., Feb. 7, 2013) (citing *Moore v. Apfel*, 216 F.3d 864, 868-69 (9th Cir. 2000)).  More importantly, the undersigned agrees with other courts that have found that in the context of a hearing conducted in connection with a claim for disability under the Social Security Act, to succeed on a due process claim of inadequate translation or failure to interpret a portion of the proceedings, the plaintiff "must show that the untranslated testimony would have affected the outcome of the hearing." *See id*. (drawing on case law addressing due process rights in immigration hearings) (citing *Tejeda-Mata v. INS*, 626 F.2d 721, 727 (9th Cir.1980); *Acewicz v. U.S. I.N.S.*, 984 F.2d 1056, 1063 (9th Cir.1993); *Aman*, 2011 WL 4505173, at *9);  *see also Martinez v. Astrue,*  Case No. 07-cv-0699, 2009 WL 840661, at *1 (D.Conn., March 30, 2009) ("For there to have been prejudicial interference with Martinez's access to her interpreter, Martinez must show that, due to the alleged interference, there was a material omission or inaccurate interpretation of key testimony").  Here, Plaintiff has made no such showing.  Although she argues in her summary judgment motion that the use of an uncertified interpreter caused "many difficulties," including frequent interruptions by the ALJ, there is nothing in the transcript that suggests that these alleged difficulties resulted from any shortcomings in the interpreting that Plaintiff's daughter provided.  Accordingly, the Court rejects Plaintiff's argument that she was denied her right to Due Process because a qualified interpreter was not used at the hearing.

## C.    Consideration of Obesity

Plaintiff also argues that the ALJ erred in failing to consider her obesity in determining whether she is disabled.  The Court agrees.

Social Security Ruling 02-1p provides, in relevant part, as follows:

> Obesity can cause limitation of function. The functions likely to be limited depend on many factors, including where the excess weight is carried. An individual may have limitations in any of the

> exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching. . . .
>
> The effects of obesity may not be obvious.
>
> An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. *Individuals with obesity may have problems with the ability to sustain a function over time.* As explained in SSR 96-8p ("Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims"), our RFC assessments must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule. . . .
>
> The combined effects of obesity with other impairments may be greater than might be expected without obesity. *For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone.*

SSR 02-1p (emphasis added). A key issue with respect to Plaintiff's claim is the length of time she is able to stand or walk during an 8-hour work day. The ALJ apparently concluded that Plaintiff could stand and walk 6 hours out of an 8-hour work day.[6] There is scant evidence in the record on this question, however. As discussed further below, the ALJ had a duty to develop the record as to this key limitation and, in considering the limitations that resulted from her joint pain, to take into account the impact that Plaintiff's obesity may have on her ability to sustain an activity over time. In failing to do so, the ALJ committed reversible error.

**D.    Whether the Commissioner's Decision is Supported by Substantial Evidence**

At Step Five, the ALJ found that Plaintiff was not disabled because she could perform past relevant work. In the alternative, he concluded that she could perform certain sedentary, unskilled jobs, including various assembly jobs. The finding that Plaintiff could perform past relevant work

---

[6] As noted above, in what appears to be a clerical error, the ALJ omitted the number from his RFC, leaving the Court to guess as to his finding on this limitation. Based on the ALJ's conclusion that Plaintiff can do past relevant work, the Court deduces that he found that Plaintiff could stand or walk 6 hours out of the 8-hour work day because that is the only hypothetical that was posed to the VE that supports that finding. If the Court is incorrect and the ALJ actually found that Plaintiff could stand only 2 hours out of an 8-hour work day, the finding that Plaintiff can perform past relevant work at Step Five is not supported by substantial evidence and requires reversal.

16

is based, in part, on the conclusion that she could stand and walk 6 hours out of an 8-hour work day.  The alternative holding is based on the assumption that Plaintiff can communicate in English.  As to both of these questions, the record is poorly developed, at best, and the ALJ did not attempt to develop the record.  Further, neither conclusion is supported by substantial evidence.

### 1.  Plaintiff's Stand/Walk Limitation

To determine the claimant's credibility as to her symptoms and pain, the ALJ must engage in a two-step analysis.  *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004) (citing *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996)).  In the first step, the claimant must produce objective medical evidence demonstrating an underlying impairment that could reasonably be expected to produce pain or other symptoms.  *Id.* (*quoting Smolen*, 80 F.3d at 1281-82).  If this test is satisfied, the ALJ may discredit the claimant's testimony in part or in whole by providing "specific, cogent reasons for the disbelief."  *See Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)(citing *Rashad v. Sullivan*, 903 F.2d 1229, 1231 (9th Cir. 1990)).  But if there is no affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony.  *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005) (citing *Lester*, 81 F.3d at 834).  The ALJ must support these reasons with specific findings that "'convincingly justify [her] rejection' of the claimant's excess pain testimony."  *Stewart v. Sullivan*, 881 F.2d 740, 743 (9th Cir. 1989) (*quoting Bellamy v. Secretary of Health & Human Servs.*, 755 F.2d 1380, 1382 (9th Cir. 1985)); see also *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993) ("It's not sufficient for the ALJ to make only general findings; he must state which pain testimony is not credible and what evidence suggests the complaints are not credible.").

The ALJ correctly found that Ms. DeLozano's medically determinable impairment could reasonably be expected to cause her alleged symptoms.  AR 31.  Therefore, the ALJ properly proceeded to step two of the analysis.  The ALJ did not find that Ms. DeLozano is a malingerer.  The Court also finds that there is no affirmative evidence in the record suggesting that she was malingering.  "'Malingering' is a medical term defined as the willful, deliberate, and fraudulent feigning or exaggeration of the symptoms of illness or injury."  *Morales v. Apfel*, 225 F.3d 310, 313 n.3 (3d Cir. 2000) (quoting Dorland's Illustrated Medical Dictionary 982 (2d ed. 1994)).

United States District Court
Northern District of California

Because no evidence of malingering exists, the ALJ was obligated to present "clear and convincing" reasons for rejecting Plaintiff's description of symptoms, including her testimony at the hearing that she "cannot be standing" because if she "stands a lot it hurts," AR 41, as well as her statement in the Function Report that she cannot stand or walk for more than 1/2 an hour at a time. AR 124.

The ALJ offered the following reasons in support of his conclusion that Plaintiff's complaints about her symptoms were not fully credible:  1) "the fact that the record reflects that the surgery was generally successful in relieving the symptoms;" 2) Plaintiff has reported that the pain medication she was prescribed helped relieve her pain; 3) her daily activities "are not limited to the extent one would expect;"  4) there are no "significant clinical or laboratory abnormalities one would expect if the claimant were, in fact disabled;" and 5) the record does not "contain any opinions from treating or examining physicians indicating that the claimant is disabled."  AR 31-32.  Whether considered collectively or individually, these reasons do not constitute clear and convincing reasons for rejecting Plaintiff's description of her limitations and do not provide substantial evidence for the ALJ's conclusion that Plaintiff can stand and walk for up to 6 hours in an 8-hour day.

First, the conclusion that Plaintiff's surgery was "generally successful relieving the symptoms" is not supported by the record.  As a preliminary matter, it is not clear if the ALJ is referring to Plaintiff's left hip surgery or her right knee arthroscopy.  As to the latter, it is particularly unclear whether the procedure ameliorated Plaintiff's knee pain.   The only medical record provided by the hospital that performed Plaintiff's arthroscopy is a letter from Dr. Nissen stating that Plaintiff was a candidate for a further procedure. AR 188.  A reasonable reading of this letter is that Dr. Nissen believed that the procedure he had performed had not been fully successful or at least, was insufficient to address Plaintiff's knee problem.  This conclusion is consistent with the notation by Dr. Astaphan in December 2007, "needs surgery. No $." AR 221; *see also* AR 218 (1/22/08 notation by Dr. Astaphan, "Osteoarthritis - can't afford surgery").  To the extent the record is ambiguous as to whether the arthroscopy was successful, or even alleviated Plaintiff's symptoms as to her right knee pain, the ALJ had a duty to develop the record.  No

doctor's opinion was solicited on this question and the medical records that were provided by St. Luke's Hospital appear to be incomplete.  Nor was Plaintiff asked at the hearing to describe the procedure that was performed, whether the procedure in fact alleviated her pain or had an impact on her ability to stand and walk for prolonged periods, or to provide additional information about whatever further surgery had been recommended by her doctors.  Therefore, the Court finds that the ALJ's conclusion that "the surgery" was successful is not supported by substantial evidence and that he failed to satisfy his obligation to develop the record on this issue.  Nor does the alleged success of Plaintiff's surgery constitute a clear and convincing reason for rejecting Plaintiff's description of her symptoms.

Second, while the ALJ is correct that Plaintiff reported that the prescription pain medication "helped," there is nothing in the record from any treatment provider or from Plaintiff herself that allows one to draw any specific inferences as to how this may have affected Plaintiff's ability to stand and walk for prolonged periods.  Nor does the record indicate that the prescription medications consistently alleviated Plaintiff's pain.  For example, on January 22, 2008, Dr. Astaphan wrote that the Ultram helps but that Plaintiff's osteoarthritis "still acts up."  AR 218. Thus, the evidence that prescribed medications were helpful is not a clear and convincing reason that is sufficient to reject Plaintiff's description of her pain and stand/ walk limitation.

Third, although the ALJ offers the conclusory opinion that Plaintiff's daily activities "are not limited to the extent one would expect," he fails to explain why any of the activities described by Plaintiff  at the hearing or in her Function Report is sufficient to demonstrate that Plaintiff can stand and walk up to 6 hours in an 8-hour day.   While a claimant's daily activities may cast doubt on the validity of the claimant's testimony, "[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits."  *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also Benecke v. Barnhart*, 379 F.3d 587, 594 (9th Cir. 2004).  Many activities are not "easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication."  *Id.*  None of the activities described by Plaintiff in her Function Report demonstrates an ability to stand and walk 6 hours in an 8-hour work day. At most, Plaintiff's statement that she sometimes helps with chores that take

1   her two hours, performed slowly, AR 121, *might* support the conclusion that she can stand 2 hours

2   out of an 8-hour work day.  Therefore, the ALJ's reliance on Plaintiff's daily activities to support

3   his RFC findings does not constitute a clear and convincing reason for finding that Plaintiff's

4   description of her symptoms is not fully credible.

5       Fourth, the ALJ states that there are no "significant clinical or laboratory abnormalities"

6   one would expect if the claimant were, in fact disabled.  Whatever the "clinical or laboratory

7   abnormalities" the ALJ would expect to find, it is clear that the record is not adequately

8   developed.   The MRI of Plaintiff's knee done on February 8, 2006 revealed not only a tear in the

9   meniscus but also "Grade IV chondromalacic changes," "[s]mall joint effusion" and "[p]repatellar

10  bursitis."  AR 164.  The record does not, however, contain any evidence that indicates whether

11  these findings constitute significant abnormalities.  Similarly, while Dr. Manlove-Simmons

12  ordered x-rays of Plaintiff's hips, she wrote her report before she received the results.  *See* AR

13  170, 174.   The x-rays revealed "some spurring of the acetabulum of the right hip with possibility

14  of some subchondral lucency not excluded" and recommended follow-up, AR 177, but there is no

15  evidence in the record, such a doctor's opinion, regarding the significance of this finding.  Finally,

16  Dr. Astaphan made notations in treatment notes in 2007 that Plaintiff's right knee should be x-

17  rayed.  AR 192, 222.  There is no indication, though, that the ALJ sought to determine whether the

18  x-rays had been done or to obtain the results (assuming the x-rays were taken).  Having failed to

19  develop the record as to possible clinical or laboratory abnormalities, the ALJ's conclusion that

20  there were no significant clinical or laboratory abnormalities is not supported by substantial

21  evidence.

22      Finally, the ALJ's statement that "the record does not contain any opinions from treating or

23  examining physicians indicating that the claimant is disabled" is simply incorrect.  In treatment

24  notes that were in the record at the time the ALJ issued his decision, Plaintiff's treating physician

25  noted that he was recommending permanent disability, as was highlighted by both of the medical

26  consultants who reviewed the record.  AR 161-162, 186, 200.[7]   The Commissioner is correct that

27

28  [7] As noted above, the letter recommending permanent disability, dated June 6, 2006, was
    submitted after the ALJ issued his decision but before Plaintiff's appeal was finalized. Therefore,

it is not required to defer to the opinion of a treating physician as to the ultimate question of disability. *See Ukolov v. Barnhart*, 420 F.3d 1002, 1004 (9th Cir. 2005) ("Although a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability"). This does not mean, however, that an ALJ's reliance on the *absence* of such opinions can constitute a legitimate (much less clear and convincing) reason for questioning the Plaintiff's credibility where, as here, Plaintiff's treating physician did, in fact, conclude that she was disabled.

For the reasons stated above, the Court finds that the ALJ did not provide clear and convincing, or even legitimate reasons for finding that Plaintiff's description of her limitations - and particularly her limitations with respect to the amount of time in an 8-hour work day she can stand and walk - were not fully credible. Nor is this finding supported by substantial evidence in the record. Consequently, the ALJ's conclusion that Plaintiff could perform her past relevant work also is not supported by substantial evidence.

### 2. Plaintiff's Ability to Communicate in English

As an alternative ground for finding that Plaintiff is not disabled, the ALJ reasoned that she could perform certain sedentary unskilled jobs. The VE testified that these jobs could only be performed, however, by an individual who can communicate in English. Thus, to affirm the finding that Plaintiff is not disabled on this ground, there must be substantial evidence in the record that Plaintiff can communicate in English. There is no evidence in the record that supports this conclusion.

As discussed above, at Step Five, the Commissioner has the burden to demonstrate that the claimant can perform "other work" that exists in "significant numbers" in the national economy, taking into account the claimant's RFC, age, education, and work experience. *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). "The term education . . . includes how well you are able to

the Commissioner had an obligation to consider it. *See Brewes v. Commissioner of Social Sec. Admin.*, 682 F.3d 1157, 1159-1160 (9th Cir. 2012). Because the contents of the letter were also reflected in Dr. Vazquez's treatment records, however, the Court need not address what impact, if any, the June 6, 2006 letter should have had on the Commissioner's decision to deny disability.

United States District Court
Northern District of California

United States District Court
Northern District of California

communicate in English since this ability is often acquired or improved by education." 20 C.F.R. § 404.1564(b).   It also includes English language literacy, which refers to the ability to read and write in English.   *Id*.   Here, Plaintiff stated that she does not speak or understand English on her Disability Report.   Similarly, her Function Report was completed for her by her daughter, *see* AR 126, who also assisted Plaintiff at the hearing.   It can be inferred from the transcript of the hearing that the ALJ concluded Plaintiff had some degree of aural comprehension of English language. He did not, however, make any findings as to whether she could *communicate* in English and there is no suggestion that Plaintiff ever spoke in English at the hearing.   Again, to the extent there is ambiguity in the record as to Plaintiff's ability to communicate in English, the ALJ had a duty to develop the record.   Having failed to develop the record or point to any evidence suggesting that Plaintiff can communicate in English, his conclusion that Plaintiff can perform various sedentary unskilled jobs, including lens inserter and eyeglass frame inspector, is not supported by substantial evidence.

### E.   Appropriate Remedy

Where "additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded."   *Marcia v. Sullivan*, 900 F.2d 172, 176-77 (9th Cir. 1990).   However, the Court "may direct an award of benefits where the record has been fully developed and where further administrative proceedings would serve no useful purpose." *Brewes*, 682 F.3d at 1164 (citation omitted).   As discussed above, the record in this case has not been adequately developed with respect to 1) Plaintiff's ability to stand and walk for prolonged periods and, in particular, whether her knee and hip pain, in combination with her obesity, permit her to stand for 6 hours in an 8-hour work day; and 2) whether she can communicate in English such that she can perform the sedentary unskilled jobs identified by the VE at the hearing. Therefore, remand for further proceedings is required to determine whether Plaintiff is disabled.

## IV.   CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment is GRANTED; Defendant's motion for summary judgment is DENIED.   The Court reverses the decision of the

1   ALJ and remands for further proceedings to address the two issues identified above.

2        **IT IS SO ORDERED.**

3

4   Dated: March 27, 2015

5

6        _____

7        JOSEPH C. SPERO
         United States Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28